UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GARY LEE ROBINSON,

       Petitioner,

                           CASE NO. 14-13512

v.

                           HONORABLE VICTORIA A. ROBERTS

KENNETH McKEE,

       Respondent.

_____/

**OPINION AND ORDER
DENYING THE PETITION FOR A WRIT OF HABEAS CORPUS,
GRANTING IN PART A CERTIFICATE OF APPEALABILITY,
AND GRANTING PERMISSION TO APPEAL *IN FORMA PAUPERIS***

This matter came before the Court on petitioner Gary Lee Robinson's *pro se* habeas corpus petition, which challenges Petitioner's convictions for first-degree murder, Mich. Comp. Laws § 750.316(1)(a), felon in possession of a firearm, Mich. Comp. Laws § 750.224f, and possession of a firearm during the commission of a felony, Mich. Comp. Laws § 750.227b. Petitioner alleges as grounds for relief that: (1) his incriminating statement to the police was involuntary and inadmissible at trial; (2) the state trial court violated his constitutional right to a public trial; (3 - 4) his trial attorney was ineffective for failing to (a) object to the closure of the courtroom and (b) advise him of his right to testify at an evidentiary hearing; and (5) appellate counsel was ineffective for failing to investigate or raise a significant and obvious claim about trial counsel. The State urges the Court to deny the petition because Petitioner procedurally defaulted two of his claims and because the state-court decisions were objectively reasonable. The Court agrees that Petitioner's claims do not warrant habeas relief. Accordingly, the petition will be denied.

# I. Background

The county prosecutor initially charged Petitioner with four crimes:  first-degree, premeditated murder, felon in possession of a firearm, carrying a concealed weapon, and possession of a firearm during the commission of, or attempt to commit, a felony. The charges arose from the fatal shooting of Gregory Ingram in Flint, Michigan on February 26, 2010.  In a pretrial statement to the police, Petitioner admitted that he fired his assault rifle at Ingram about ten times.  Petitioner's pretrial attorney moved to suppress Petitioner's statement, but the trial court denied the motion after conducting an evidentiary hearing.

A different attorney represented Petitioner at trial in Genesee County Circuit Court. Petitioner was tried with co-defendants Dequeze Dixon and Calvin LeSears, but each defendant had his own jury.  The state appellate court accurately summarized the facts as follows:

> The primary witness was Jason Sutton, who was present during the murder but uninvolved.  He testified that he knew Robinson and Dixon already at the time, but he discovered LeSears's identity later. Sutton testified that he was picked up by defendants while walking home.  Dixon was driving a vehicle owned by his girlfriend, Devonda Jiles.  Either Dixon or Robinson told Sutton, "If we didn't know who you was, we were going to get you."  They drove past the victim, at which point Dixon said, "There's Greg, let's get on him."  Robinson got out of the car first, and then Dixon turned the car around and parked, whereupon Dixon and LeSears also got out.  Sutton remained in the vehicle using his telephone.
>
> Sutton testified that he heard a barrage of gunfire from multiple guns: an assault rifle, a shotgun, and a handgun.  He saw all three defendants outside shooting the victim.  A medical examination would later identify the victim's cause of death as multiple gunshot wounds from at least three different kinds of guns.  When defendants returned to the vehicle, Sutton observed Robinson with an assault rifle, Dixon with a shotgun, and LeSears with a handgun.  Dixon advised Sutton that they would kill him if he told anyone about the events of the evening.  They then dropped Sutton off at his house. Sutton continued to associate with defendants out of fear that they would believe he had told authorities about the shooting.  A few weeks later, Sutton was again in the same vehicle with Dixon and Sutton's cousin, when police attempted to pull the vehicle over, apparently for unrelated reasons.

All of the occupants jumped out and fled; Sutton was the only one apprehended. He was taken into custody for fleeing and eluding, and Jiles's car was impounded. When Jiles discovered that her car had been impounded, she falsely informed 9–1–1 and a police officer that her vehicle had been stolen. While incarcerated, Sutton asked to talk to the police about the victim's murder. After Sutton was interviewed, Robinson was arrested two days later, and Dixon was arrested later that same day. Sutton subsequently picked LeSears out of a photographic lineup as the third individual, asserting that he was about 80 percent certain. LeSears was arrested about a month later for an unrelated matter, after which Sutton identified LeSears with certainty out of a physical lineup.

*People v. Robinson*, No. 304936, 2013 WL 4866316, at *1 (Mich. Ct. App. Sept. 12, 2013) (unpublished).

The prosecutor's theory was that Petitioner caused Ingram's death or aided and abetted his co-defendants in killing Ingram. Petitioner did not testify or present any witnesses. His theory of the case was that Ingram was not credible and that his statements to the police were involuntary because the police interrogated him over a period of approximately fourteen hours and lied to him during the interrogation.

The jury was unable to reach a verdict on the third count (carrying a concealed weapon). The prosecutor then dismissed that count, and the jury found Petitioner guilty, as charged, of first-degree murder, felon in possession of a firearm, and possession of a firearm during the commission of a felony. On June 21, 2011, the trial court sentenced Petitioner to life imprisonment for the murder conviction, a concurrent term of two to five years in prison for the felon-in-possession conviction, and a consecutive term of two years for the felony-firearm conviction with credit for 459 days already spent in custody.

Petitioner argued in an appeal of right that: (1) his statement to the police was inadmissible at trial because the police violated his constitutional right against self-incrimination;

(2) the exclusion of the public from his trial violated his constitutional right to a public trial; and (3) defense counsel was ineffective for failing to object to the closure of the courtroom to the public. The Michigan Court of Appeals rejected these claims and affirmed Petitioner's convictions in a *per curiam* opinion. *See id.* Petitioner raised the same three claims in the Michigan Supreme Court, which denied leave to appeal on January 31, 2014. *See People v. Robinson*, 495 Mich. 936; 843 N.W.2d 202 (2014) (table).

On September 3, 2014, Petitioner signed and dated his habeas corpus petition, and on September 9, 2014, the Clerk of the Court filed the petition. The grounds for relief set forth in the initial petition are the same three claims that Petitioner raised on direct appeal from his convictions.

The State argued in an answer to the petition that Petitioner procedurally defaulted his second claim (denial of the right to a public trial) and that his other claims lack merit. Petitioner moved to supplement his petition and to stay his case while he exhausted state remedies for two new claims about his first trial attorney and his appellate attorney. On May 5, 2015, the Court granted Petitioner's motions and closed this case for administrative purposes.

Petitioner subsequently filed a *pro se* motion for relief from judgment in the state trial court. He claimed that: (1) his first attorney failed to advise him of his right to testify at the evidentiary hearing on his motion to suppress his custodial statement, and (2) his appellate attorney failed to investigate and raise his claim about trial counsel. The trial court denied Petitioner's motion because Petitioner failed to satisfy the "cause and prejudice" requirements of Michigan Court Rule 6.508(D)(3)(a) and (b) and because the motion lacked merit. *See People v. Robinson*, No. 10-26762-FC (Genesee Cty. Cir. Ct. July 13, 2015) (unpublished).

4

Petitioner appealed the trial court's decision without success. The Michigan Court of Appeals denied leave to appeal for failure to establish entitlement to relief under Michigan Court Rule 6.508(D). *See People v. Robinson*, No. 328876 (Mich. Ct. App. Nov. 4, 2015) (unpublished). On September 27, 2016, the Michigan Supreme Court denied leave to appeal for the same reason. *See People v. Robinson*, 500 Mich. 864; 884 N.W.2d 791 (2016) (table).

On December 6, 2016, Petitioner returned to federal court and filed a motion to re-open this case. Although he did not file a separate amended petition, the motion includes a brief, which addresses the three claims that Petitioner raised in his initial petition and the two new claims that he raised during post-appellate proceedings in state court. The State filed a supplemental answer in which it argued that Petitioner procedurally defaulted his claim about his pretrial attorney and that his claim about appellate counsel lacked merit.

## II. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires habeas petitioners who challenge "a matter 'adjudicated on the merits in State court' to show that the relevant state court 'decision' (1) 'was contrary to, or involved an unreasonable application of, clearly established Federal law,' or (2) 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.' " *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) (quoting 28 U.S.C. § 2254(d)). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000). "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' *Lindh v.*

5

*Murphy*, 521 U.S. 320, 333, n. 7 (1997), and 'demands that state-court decisions be given the benefit of the doubt,' *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*)." *Renico v. Lett*, 559 U.S. 766, 773 (2010).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). To obtain a writ of habeas corpus from a federal court, a state prisoner must show that the state court's ruling on his or her claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103. A state-court's factual determinations are presumed correct on federal habeas review, 28 U.S.C. § 2254(e)(1), and review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

### III. Analysis

**A. Petitioner's Pretrial Statement to the Police**

Petitioner alleges that the prosecutor violated his right to a fair trial by introducing in evidence his pretrial statement to the police. Petitioner contends that the police violated his Fifth Amendment right not to incriminate himself by continuing to interrogate him after he said he was done and had nothing to say. He further alleges that the police coerced him into confessing by isolating him and repeatedly interviewing him.

The Michigan Court of Appeals summarized the facts leading to Petitioner's confession as follows:

[D]efendant was read his *Miranda*[1] rights, and defendant waived those rights. The interviewing officer asked defendant some preliminary questions to establish defendant's identity and coherence. The first interview lasted approximately three hours and ended when defendant "denied any knowledge of the homicide, stated that he wasn't involved." Although defendant placed his head down on the table and appeared tired, defendant continued to be questioned. At the end of that interview, defendant was returned to a holding cell.

Defendant was given some food and was interviewed a second time after the police continued their investigation and obtained more information. Defendant was not re-read his *Miranda* rights, but he was advised that he was still under arrest and he verified that he recalled and understood his rights. Robinson was specifically asked about the homicide and informed that Dixon had been arrested. Defendant stated, "I'm done, I got nothing to say." The police continued to question defendant, noting that Dixon and Sutton had both given statements that Robinson participated in the homicide. Defendant did not specifically ask to terminate the questioning or request an attorney, but he eventually said, "I'm ready to go and I'm done with it." The interview was terminated after less than half an hour, after which an evidence technician took defendant's shoes into evidence.

Later that night, while the police officer was interviewing Dixon, Robinson asked to talk to the police officer. Robinson confirmed that he understood his rights and made an inculpatory statement regarding his involvement in the Ingram homicide and verbally provided a statement that was written out by the interviewing officer. Robinson then added information pertaining to the location of the gun used during the homicide, indicated his willingness to take police to the location, and signed the statement. In his own hand, Robinson also wrote out apologies to the prosecutor and Ingram's aunt. Following an inquiry regarding his treatment, Robinson agreed to write down that he had been treated fairly.

*Robinson*, 2013 WL 4866316, at *2 (footnote in original as note 2).

The officer in charge of the case, Sergeant Mitch Brown, testified at the pretrial

evidentiary hearing on Petitioner's motion to suppress his statement

that Robinson . . . never requested an attorney or to stop the interviews. He acknowledged that he was not always truthful with Robinson during the interviews, in part, suggesting that Dixon and Sutton had "put it all on him." He also acknowledged the possibility that he raised his voice during the interview.

[1] *Miranda v. Arizona*, 384 U.S. 436; 86 S Ct 1602; 16 L.Ed.2d 694 (1966).

> He opined that a suspect's indication that he refused to answer a specific question did not require termination of the interview.

*Id*. The trial court denied Petitioner's motion to suppress his statement, and at trial, the prosecutor played a videotape of the three custodial interviews for the jury. The prosecutor also provided the jury with a transcript of the interviews.

Petitioner raised his current claim on direct review of his convictions. The Michigan Court of Appeals adjudicated his claim on the merits and concluded that Petitioner's statement to the police was voluntary and admissible.

### 1. *Miranda*

Petitioner claims that the police violated his right not to incriminate himself by not advising him of his constitutional rights before the second and third interviews and by continuing to interrogate him after he indicated that he had nothing more to say. Petitioner also asserts that the waiver of his rights was not voluntary because he was held in a cell for an entire day and was subjected to repeated and prolonged questioning and coercive behavior.

### a. **Clearly Established Federal Law**

The Fifth Amendment to the United States Constitution provides that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. "To give force to the Constitution's protection against compelled self-incrimination, the [Supreme] Court established in *Miranda* [*v. Arizona*, 384 U.S. 436 (1966)] 'certain procedural safeguards that require police to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments before commencing custodial interrogation.'" *Florida v. Powell*, 559 U.S. 50, 59 (2010) (quoting *Duckworth v. Eagan*, 492 U.S. 195, 201 (1989)). "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he

does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444.

> After the warnings are given, if the suspect indicates that he wishes to remain silent, the interrogation must cease. *Id.,* at 473–474, 86 S.Ct. 1602. Similarly, if the suspect states that he wants an attorney, the interrogation must cease until an attorney is present. *Id.,* at 474, 86 S.Ct. 1602. Critically, however, a suspect can waive these rights. *Id.,* at 475, 86 S.Ct. 1602. To establish a valid waiver, the State must show that the waiver was knowing, intelligent, and voluntary under the "high standar[d] of proof for the waiver of constitutional rights [set forth in] *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)." *Id.,* at 475, 86 S.Ct. 1602.

*Maryland v. Shatzer*, 559 U.S. 98, 104 (2010). One form of waiver occurs when "the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981).

### b. The Advice of Rights

It is clear from the record that Sergeant Brown advised Petitioner of his constitutional rights during the first interview and that Petitioner waived his rights and voluntarily agreed to speak with Sergeant Brown at the interview. *See* 3/18/10 Interview Tr. at 15-16 (Part One), ECF No. 7-2, PageID. 147-48. Although Petitioner did not sign a written waiver of his rights, "there is no requirement that *Miranda* rights can be waived only in writing." *United States v. Stevens*, 445 F.2d 304, 305 (6th Cir. 1971).

Sergeant Brown did not re-read Petitioner's constitutional rights to him before the second and third interviews. However, he did remind Petitioner of their prior discussion regarding his

constitutional rights, Petitioner claimed to remember the prior discussion,[2] and the length of the time between the interviews was not excessive. The second interview occurred about five and a quarter hours after the first interview, and the third interview occurred about three and a half hours after the second interview.

"[C]ourts have generally rejected a *per se* rule as to when a suspect must be readvised of his rights after the passage of time or a change in questioners." *United States v. Andaverde,* 64 F.3d 1305, 1312 (9th Cir. 1995). In fact, a number of federal circuit courts of appeals "have ruled that re-warning is not required simply because time has elapsed." *United States v. Weekley*, 130 F.3d 747, 751 (6th Cir. 1997) (collecting cases); *see also United States v. Pruden*, 398 F.3d 241, 246 (3d Cir. 2005) ("*Miranda . . .* does not necessarily require that a suspect be warned anew each time he is questioned.") (citing *Guam v. Dela Pena,* 72 F.3d 767, 769–70 (9th Cir. 1995) (finding that a fifteen-hour delay between waiver and statement does not require new warning and waiver)).

Even a three-day delay between the advice of rights and a subsequent interrogation is acceptable if the suspect was clearly aware of his rights, understood those rights, was questioned by the same police officer who reminded him of his rights, and there is no evidence of coercion or promises or that anything affected the suspect's understanding of his rights. *United States v. White*, 68 F. App'x 535, 538 (6th Cir. 2003). Petitioner clearly was aware of, and understood,

---

[2] *See* 3/18/10 Interview Tr. (Part Two) at 2, ECF No. 7-3, PageID. 209; 3/18/10 Interview Tr. (Part Three) at 2, ECF No. 7-4, PageID.219.

his rights.  Sergeant Brown questioned him during each of the interviews[3] and reminded Petitioner of his rights, there is no evidence that anything affected Petitioner's understanding of his rights.  He also was not coerced or promised anything other than an explanation to the prosecutor.  Therefore, Petitioner's confession was not involuntary simply because Sergeant Brown did not re-read his constitutional rights to him before the second and third interviews.

### c. The Waivers

Petitioner maintains that he did not voluntarily waive his constitutional rights.  The record, however, suggests otherwise.

Before the first interview, Sergeant Brown read Petitioner's constitutional rights to him.  Petitioner indicated that he understood his rights and was familiar with them.  Sergeant Brown then asked Petitioner whether he wished to waive his right to have an attorney and wanted to talk with Brown.  Petitioner answered, "I'll talk to you."  *See* 3/18/10 Interview Tr. (Part One) at 15-17, ECF No. 7-2, PageID 147-49.   This was a clear waiver of the rights to counsel and to remain silent.

Before the second interview, Sergeant Brown reminded Petitioner that the rights remained in effect, and Petitioner claimed to remember being advised of his rights.  He did not object to being questioned, and he did not request an attorney or refuse to talk with Sergeant Brown.  *See* 3/18/10 Interview Tr. (Part Two) at 2, ECF No. 7-3, PageID. 209.

---

[3]  Sergeant Devon Bernritter assisted Sergeant Brown during the first and second interviews. Sergeant Jeff Collins and an ATF agent were present with Sergeant Brown during the third interview.

"An express written or oral statement of waiver of the right to remain silent or of the right to counsel . . . is not inevitably either necessary or sufficient to establish waiver." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). While "mere silence is not enough," "[t]hat does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights." *Id*. "[I]n at least some cases waiver can be clearly inferred from the actions and words of the person interrogated." *Id*.

Petitioner's acknowledgment of his rights, his understanding of his rights, and his willingness to speak with Sergeant Brown are indications that he voluntarily waived his constitutional rights before the second interview. Although he subsequently stated during the second interview that he wanted to home, that he was "done," and that he had nothing to tell the officers, those comments were ambiguous. He could have meant that he was innocent and had nothing to confess. Moreover, when Sergeant Brown subsequently asked Petitioner whether he wanted to hear what the officers had to say, Petitioner answered, "Yeah." *See* 3/18/10 Interview Tr. (Part Two) at 5-6, ECF No. 7-3, PageID. 212-13. This was a voluntary waiver of the right to remain silent and to terminate the interview.

Even if Petitioner's comments during the second interview constituted an invocation of the right to remain silent, Petitioner did not confess to his involvement in the murder during that interview. So, there was no confession to suppress. The interview ended when Petitioner indicated that he was ready to go to the county jail and was "done with this." *Id*. at 9-10, PageID 216-17.

Petitioner himself initiated the third interview. He also indicated that he remembered his rights. *See* 3/18/10 Interview Tr. (Part Three) at 1-2, ECF No. 7-4, PageID. 218-19. By initiating the interview and acknowledging his rights, Petitioner waived his rights to remain silent and to have an attorney present. *See Wyrick v. Fields*, 459 U.S. 42, 47 (1982) (concluding that, by requesting a polygraph examination, the suspect initiated the interrogation and waived his rights not to proceed without an attorney present and not to be questioned about the crime that he was suspected of committing).

The Court concludes that Petitioner waived his rights to remain silent and to have an attorney present during the interviews.

### 2. The Voluntariness of the Confession

The remaining question is whether the police coerced Petitioner into waiving his rights and making a confession. Petitioner contends that the police coerced his statement by keeping him in a holding cell for an entire day, interviewing him three times that day, and failing to read his constitutional rights to him before the second and third interviews. Although Petitioner ultimately initiated the third interview and confessed to shooting the victim, he asserts that his request to speak with the police after the second interview was the only way he could change his situation.

### a. Clearly Established Federal Law

Confessions that result from a police interrogation "must be free and voluntary" to be admissible at trial. *Bram v. United States*, 168 U.S. 532, 542 (1897) (quoting 3 Russ. Crimes (6th Ed.) 478). The test for voluntariness of a confession is whether

> "the confession [is] the product of an essentially free and unconstrained choice by its maker[.]  If it is, if he has willed to confess, it may be used against him.  If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process."

*Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973) (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)).  When determining whether a defendant's will was overborne in a particular case, courts must assess

> the totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation.  Some of the factors taken into account have included the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep.

*Id*. at 226 (citations omitted).  "In a federal habeas action, the burden of proving that the confession was involuntary rests with the petitioner," *Boles v. Foltz*, 816 F.2d 1132, 1136 (6th Cir. 1987) (citing *Jurak v. Estelle*, 623 F.2d 929, 937 (5th Cir. 1980)), and "voluntariness need only be proven by a preponderance of the evidence."  *Id*. (citing *Lego v. Twomey*, 404 U.S. 477 (1972)).

### b.  Application

The record indicates that the police arrested Petitioner about 7:30 a.m. on March 18, 2010.  He was eighteen years old at the time and a senior in high school with plans to attend college the following year.  Transcripts of the interview indicate that he was a perceptive young man with normal intelligence.

The first interview was the longest one.  It began at 10:39 a.m. on the day of Petitioner's arrest and ended about four and a quarter hours later at 2:58 p.m.   Petitioner claimed to

understand the rights that he was waiving by speaking with Sergeant Brown, and he admitted to having prior experience with the criminal justice system.

Petitioner was permitted to use the bathroom, and he did not request any food or drink. At one point during the interview, Petitioner said, "I already told y'all what I have to say," and later in the interview he stated that was ready to go to the county jail. But at no time did he request an attorney or ask to terminate the interview. He also did not confess to the crime. Despite the lengthy interview and Sergeant Brown's repetitious comments, Petitioner maintained that he had nothing to do with the murder and that the police had detained the wrong person.

An officer provided Petitioner with a meal about 5:00 p.m., and the second interview commenced at 8:15 p.m. That interview lasted only nineteen minutes. At one point, Petitioner stated that he wanted to go home, that he was done, and that he had nothing to tell the officers, but when the officer asked Petitioner whether he was interested in hearing what the police had to say, Petitioner responded, "Yeah." The interview continued, and it concluded shortly afterward at 8:34 p.m. when Petitioner stated that he was ready to go to the county jail and was done with the interview. The third and final interview commenced at 11:54 p.m. that day, but Petitioner initiated that interview, and as the state court pointed out, "There is no indication that police continued any form of interaction with Robinson that improperly influenced his election to initiate the third interview or affected its voluntary nature." *Robinson*, 2013 WL 4866316, at *3.

During the third interview, Petitioner informed the officers that he wanted to tell the truth about the crime. He also stated that he wanted the police to hear it from his own mouth and that he felt better after explaining what happened on the night of the crime. He offered to write a

letter to the victim's aunt and to show the police where he hid his gun. He denied being hungry or thirsty, and he claimed that Sergeant Brown had treated him fairly.

The Court finds it troubling that Sergeant Brown admittedly lied to Petitioner at times during the previous interviews and used deceptive techniques with Petitioner. For example, he implied that Dixon had implicated Petitioner in the crime even though Brown had not yet interviewed Dixon. *See* 1/4/11 Walker Hr'g Tr. at 40-41, ECF No. 7-13, PageID. 435-36.

Nevertheless, while "some types of police trickery can entail coercion," "trickery is not automatically coercion," *United States v. Byram*, 145 F.3d 405, 408 (1st Cir. 1998), and an officer's misrepresentation of what another suspect said does not make an otherwise voluntary confession inadmissible. *Frazier v. Cupp*, 394 U.S. 731, 739 (1969). Further, as the Michigan Court of Appeals pointed out, Sutton had already implicated Petitioner, and "it was at least broadly truthful to tell defendant that the police had evidence from witnesses against him." *Robinson*, 2013 WL 4866316, at *3.

Sergeant Brown also hinted that the prosecutor, the judge, and a jury would be more lenient toward Petitioner if he admitted his mistake, demonstrated that he was not a cold-blooded killer like "guy number 1," and showed remorse. *See, e.g.,* 3/18/10 Interview Tr. (Part One), ECF No. 7-2 at 31-46, PageID. 163-78. The Michigan Court of Appeals, however, opined that suggesting a "defendant may have had lesser culpability is hardly the kind of tactic that would undermine an interviewee's free will." *Robinson*, 2013 WL 4866316, at *3. The Federal Court of Appeals for the Sixth Circuit reached a similar conclusion in *Bray v. Caron*, 374 F. App'x 466 (6th Cir. 2010), stating that, "although police promises of leniency can be objectively coercive in certain circumstances, a statement about possible leniency upon cooperation does not render a

16

confession unconstitutional." *Id*. at 469 (citing *United States v. Craft*, 495 F.3d 259, 263-64 (6th Cir. 2007)).

Sergeant Brown also appealed to Petitioner's emotions by informing him about the victim's surviving relative and the relative's health problems. However, mere emotionalism does not necessarily invalidate a confession. *Hawkins v. Lynaugh*, 844 F.2d 1132, 1140 (5th Cir. 1988). Informing Petitioner that he was going to be booked for first-degree murder, felony firearm, and felon in possession of a firearm also did not amount to coercion. *See United States v. Bautista-Avila*, 6 F.3d 1360, 1365 (9th Cir. 1993) (agreeing "that a 'recitation of the potential sentence a defendant might receive' does not render a statement involuntary") (quoting *United States v. Paden*, 908 F.2d 1229, 1235 (5th Cir. 1990)).

To conclude, the circumstances surrounding Petitioner's confession indicate that his confession was not the result of police coercion. He asked to speak with Sergeant Brown a few hours after the second interview and then confessed to the crime without any prompting by the police.

Even if Petitioner proved police coercion, "he would still not prevail because the alleged 'coercion' was simply insufficient to overbear [his] will." *McCall v. Dutton*, 863 F.2d 454, 460 (6th Cir. 1988). His capacity for self-determination also was not critically impaired, as demonstrated by his ability to withstand Sergeant Brown's tedious interrogation of him during the first interview.

The state appellate court's rejection of Petitioner's claim was not contrary to, or an unreasonable application of, clearly established federal law. Petitioner, therefore, has no right to relief on his challenge to his confession.

## B.  The Right to a Public Trial

Petitioner alleges next that the trial court violated his Sixth Amendment right to a public trial by closing the courtroom to the public on the fourth day of trial when a cell phone rang. Petitioner contends that the trial court could have taken less drastic measures, such as confiscating the cell phone or excluding only the offending individual.

The Michigan Court of Appeals explained the factual basis for Petitioner's claim as follows:

> At the beginning of [Jason] Sutton's testimony, the judge heard a ringing telephone in the courtroom and stated:
>
>> Who's got the ringing phone?  Whoever's got it better give it up or I'm going to kick everybody out of the courtroom.  Who's got the ringing phone?  Okay, everybody leave the gallery.  You're gone. Everybody's gone.
>
> The courtroom was then cleared. When counsel requested to approach, the following interaction transpired:
>
>> *The Court:* This is my courtroom, sir.  Everyone will leave.
>
>> *Dixon's Counsel:* No.  I'm not-I'm not-that's not my concern.  I don't care who's in the gallery.  That's not my concern.
>
> The court conducted a bench conference with counsel for approximately two minutes before Sutton's testimony resumed.  It appears that no spectators were permitted to re-enter the courtroom that day, although it also appears that a

representative from the media, who had previously requested and obtained permission to video record Sutton's testimony, was permitted to continue to do so. On the next day of trial, the restriction regarding spectators was not implemented based on the trial court's permission to counsel to open the courtroom despite the lack of seats available, presumably due to the presence of three juries.

*Robinson*, 2013 WL 4866316, at *5; *see also* 4/28/11 Trial Tr. at 98-99, ECF No. 7-21, PageID. 901-02).

The Court of Appeals agreed with Petitioner that closing the courtroom to the public violated his right to a public trial. But then the Court of Appeals reviewed Petitioner's claim for "plain error" because Petitioner did not object or assert his right to a public trial during the trial. The Court of Appeals ultimately concluded that Petitioner was not entitled to a new trial on his claim because he failed to demonstrate that the closure impacted the attorneys' ability to question Jason Sutton or that the closure seriously affected the fairness, integrity, or public reputation of the judicial proceeding. *Robinson*, 2013 WL 4866316, at *5.

## 1. Procedural Default

The State argues that Petitioner procedurally defaulted his claim. In the habeas context, a procedural default is "a critical failure to comply with state procedural law." *Trest v. Cain*, 522 U.S. 87, 89 (1997). Under the doctrine of procedural default, "a federal court will not review the merits of [a state prisoner's] claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule." *Martinez v. Ryan*, 566 U.S. 1, 9 (2012). In this Circuit,

"[a] habeas petitioner's claim will be deemed procedurally defaulted if each of the following four factors is met: (1) the petitioner failed to comply with a state procedural rule; (2) the state courts enforced the rule; (3) the state procedural rule is an adequate and independent state ground for denying review of a federal

> constitutional claim; and (4) the petitioner has not shown cause and prejudice excusing the default." [*Jalowiec v. Bradshaw*, 657 F.3d 293, 302 (6th Cir. 2011)]. To determine whether a state procedural rule was applied to bar a habeas claim, [courts] look "to the last reasoned state court decision disposing of the claim." *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010) (en banc).

*Henderson v. Palmer*, 730 F.3d 554, 560 (6th Cir. 2013).

The first three procedural-default factors are easily satisfied here. First, there is a relevant state procedural rule: Michigan's contemporaneous-objection rule, which requires defendants in criminal cases to preserve their appellate claims by objecting on the same ground in the trial court. *People v. Buie*, 298 Mich. App. 50, 70-71; 825 N.W.2d 361, 374 (2012). Petitioner violated this rule by not objecting at trial to the exclusion of the public from the courtroom.

Second, the Michigan Court of Appeals enforced the contemporaneous-objection rule by reviewing Petitioner's claim for "plain error affecting [his] substantial rights." Third, because Michigan's contemporaneous-objection rule is well-established and normally enforced, it is an adequate and independent state ground for denying review of a federal constitutional claim. *Taylor v. McKee*, 649 F.3d 446, 451 (6th Cir. 2011).

The first three procedural-default factors are satisfied. Petitioner, therefore, must show "cause" for his procedural error and resulting prejudice.

## 2. "Cause and Prejudice"[4]

Petitioner alleges in his third habeas claim that his trial attorney should have objected to the closure of the courtroom. An attorney's ineffectiveness in failing to preserve a claim for review in state court can be "cause" to excuse a procedural default. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (citing *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986)). "Not just any deficiency in counsel's performance will do, however; the assistance must have been so ineffective as to violate the Federal Constitution." *Id.* Petitioner must show that his trial "counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The Court looks to Petitioner's underlying claim about the closure of the courtroom to determine whether trial counsel was ineffective for failing to object to the closure.

The Sixth Amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a . . . public trial . . . ." U.S. CONST. amend. VI. "[T]his right extends to the States," *Presley v. Georgia*, 558 U.S. 209, 212 (2010) (citing *In re Oliver*, 333 U.S. 257, 273 (1948)), and under *Waller v. Georgia*, 467 U.S. 39 (1984),

> the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

---

[4] Even though the denial of the right to a public trial is a structural error, Petitioner must show that the error prejudiced him. *Ambrose v. Booker*, 684 F.3d 638, 649 (6th Cir. 2012).

*Waller*, 467 U.S. at 48. "[A] violation of the right to a public trial is a structural error," *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1908 (2017), but "it is subject to exceptions," *id.* at 1909, and not every public-trial violation leads to a fundamentally unfair trial. *Id.* at 1911.

The interest at stake in Petitioner's case was the need for a quiet, orderly, and safe proceeding without any interruptions or distractions from the spectators. The trial court's closure of the courtroom perhaps was broader than necessary to protect the interest at stake. The court could have expelled the offending party or confiscated the cell phone that rang. Nevertheless, the courtroom was closed to spectators for only two and a quarter hours on one afternoon of a lengthy trial, and a serious incident involving spectators occurred in the courtroom and the hallway outside the courtroom on the previous day.[5] Given these circumstances, trial counsel's failure to object to the closure did not amount to deficient performance.

Trial counsel's performance also did not prejudice Petitioner because, as the Michigan Court of Appeals pointed out, the courtroom closure did not impact the attorneys' ability to question Sutton. The closure also did not seriously affect the fairness of the trial because Sutton testified for most of the following day. At that time all three of the defense attorneys cross-

---

[5] At approximately 11:19 a.m. on the third day of trial, Dequeze Dixon's mother apparently passed out while seated in the back of the courtroom. Dixon's younger brother, who claimed to be a paramedic, attempted to help his mother, but he was taken into custody and not permitted to help his mother. Other members of the Dixon family also were detained. Dixon's attorney asked the trial court to discontinue the trial for the day because, according to him, the atmosphere in the courthouse was "very highly charged" and there were "raw nerves" in the courtroom. The trial court declined to adjourn the proceedings, and the trial continued without incident at 12:05 p.m. *See* 4/27/11 Trial Tr. at 70-74, ECF No. 7-20, PageID. 749-53.

examined Sutton, and the prosecution conducted re-direct examination. *See* 4/29/11 Trial Tr. at 5-157, ECF No. 7-22, PageID. 999-1151.

The Court concludes that Petitioner's trial counsel was not ineffective for failing to object to the closure of the courtroom. Therefore, Petitioner has not shown "cause" for his procedural default. The Court need not determine whether the alleged constitutional error prejudiced Petitioner, because he has failed to show cause for his failure to comply with state law. *Smith v. Murray*, 477 U.S. 527, 533 (1986); *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000).

### 3. Miscarriage of Justice

In the absence of "cause and prejudice," a habeas petitioner may pursue a procedurally defaulted claim if he can demonstrate that failure to consider his claim will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). "A fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.' " *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (citing *Carrier*, 477 U.S. at 496). "To be credible, [a claim of actual innocence] requires [the] petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

Petitioner does not support his constitutional claim with new and reliable evidence of actual innocence. Therefore, a miscarriage of justice will not result from the Court's failure to address the merits of Petitioner's claim. His second claim is procedurally defaulted because all four factors of a procedurally-defaulted claim are satisfied.

**C. Trial Counsel's Failure to Object to the Closure of the Courtroom**

In his third ground for relief, Petitioner raises an independent claim about his trial attorney's failure to object to the closure of the courtroom to the public. Petitioner contends that counsel's failure to object was not consistent with prevailing professional standards and that a new trial is necessary, given the structural nature of the underlying error.

The Michigan Court of Appeals disagreed with Petitioner for two reasons. First, the Court of Appeals opined that the result of the trial would not have been different if the courtroom had remained open and, therefore, counsel's failure to object did not affect the outcome of the trial. And second, the Court of Appeals stated that it was not unsound trial strategy for counsel to decline to object, because the atmosphere in the courtroom apparently was tense and the proceedings were seriously disrupted on the previous day.

To prevail on his claim here, Petitioner must show that his attorney's "performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687.

> [W]hen a defendant raises a public-trial violation via an ineffective-assistance-of-counsel claim, *Strickland* prejudice is not shown automatically. Instead, the burden is on the defendant to show either a reasonable probability of a different outcome in his or her case or . . . to show that the particular public-trial violation was so serious as to render his or her trial fundamentally unfair.

*Weaver*, 137 S. Ct. at 1911. In a habeas case, moreover, review of an ineffective-assistance-of-counsel claim

> is "doubly deferential," *Cullen v. Pinholster*, 563 U.S. 170, 190, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011), because counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," *Burt v. Titlow*, 571 U.S. ——, ——, 134 S.Ct.

10, 17, 187 L.Ed.2d 348 (2013) (quoting *Strickland v. Washington,* 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); internal quotation marks omitted). In such circumstances, federal courts are to afford "both the state court and the defense attorney the benefit of the doubt." *Burt, supra*, supra, at ——, 134 S.Ct., at 13.

*Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (*per curiam*).

The closing of the courtroom to the public in Petitioner's case was brief, and it did not render Petitioner's trial fundamentally unfair. Also, because the closure did not affect the attorneys' questioning of Sutton, there is not a reasonable probability that the result of the trial would have been different if the trial court had kept the courtroom open to spectators. Therefore, Petitioner's trial attorney was not constitutionally ineffective for failing to object to the closure of the courtroom.

An objection, in fact, would have been futile, considering the trial court's response to another attorney's request for a bench conference immediately after the closure. The court responded to what it thought was an objection to the closure by saying, "This is my courtroom, sir. Everyone will leave." *See* 4/28/11 Trial Tr. at 98, ECF No. 7-21, PageID. 901. "[T]he failure to make futile objections does not constitute ineffective assistance." *Altman v. Winn*, 644 F. App'x 637, 644 (6th Cir. 2016).

Even if the Court had concluded that trial counsel was ineffective, the state court's adjudication of Petitioner's claim was not unreasonable. Under AEDPA, therefore, Petitioner has no right to relief on his claim.

**D. Defense Counsel and the Pretrial Hearing**

Petitioner alleges in his fourth claim that his pretrial attorney failed to inform him of his right to testify at the evidentiary hearing on his motion to suppress his custodial statement. Petitioner apparently wanted to testify that, before his third interview with the police, he asserted his right to counsel when speaking with Sergeant Guerro. Petitioner blames his pretrial attorney for not calling Sergeant Guerro as a witness at the hearing and for not advising Petitioner of his right to testify, and the necessity of testifying, at the hearing.

The trial court rejected Petitioner's claim during the post-appellate proceedings, in part, because Petitioner failed to raise his claim on direct appeal. The State, therefore, argues that Petitioner procedurally defaulted his claim.

**1. Procedural Default**

The state procedural rule at issue is Michigan Court 6.508(D)(3), which reads in relevant part as follows:

> (D) Entitlement to Relief. The defendant has the burden of establishing entitlement to the relief requested. The court may not grant relief to the defendant if the motion
>
> . . . .
>
> > (3) alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence or in a prior motion under this subchapter, unless the defendant demonstrates
> >
> > > (a) good cause for failure to raise such grounds on appeal or in the prior motion, and

          (b) actual prejudice from the alleged irregularities
          that support the claim for relief.

Mich. Ct. R. 6.508(D)(3).

      Petitioner violated this rule by not raising his claim about his pretrial attorney in his

appeal of right. He raised the claim for the first time in his post-appellate motion for relief from

judgment. Petitioner's violation of Rule 6.508(D)(3) satisfies the first procedural-default factor.

      The state trial court rejected Petitioner's claim, in part, because Petitioner did not show

"good cause" under Rule 6.508(D)(3)(a) or prejudice under Rule 6.508(D)(3)(b). This ruling

constituted enforcement of Rule 6.508(D), and even though the trial court also addressed

Petitioner's claim on the merits, the alternative holding does not require this Court to disregard

the state court's procedural ruling. *Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998). As explained

in *Harris v. Reed*, 489 U.S. 255 (1989),

> a state court need not fear reaching the merits of a federal claim in an *alternative*
> holding. By its very definition, the adequate and independent state ground
> doctrine requires the federal court to honor a state holding that is a sufficient basis
> for the state court's judgment, even when the state court also relies on federal law.
> See *Fox Film Corp. v. Muller*, 296 U.S. 207, 210, 56 S. Ct. 183, 184, 80 L. Ed.
> 158 (1935). Thus, by applying this doctrine to habeas cases, [*Wainwright v.
> Sykes*, 433 U.S. 72 (1977)] curtails reconsideration of the federal issue on federal
> habeas as long as the state court explicitly invokes a state procedural bar rule as a
> separate basis for decision. In this way, a state court may reach a federal question
> without sacrificing its interests in finality, federalism, and comity.

*Id*. at 264 n.10 (emphasis in original). Thus, the trial court's ruling satisfies the second

procedural-default factor.

      The third procedural-default factor also is satisfied because Rule 6.508(D) is an adequate

and independent ground on which states courts may rely to foreclose review of federal claims.

*Howard v. Bouchard*, 405 F.3d 459, 477 (6th Cir. 2005). So, to prevail on his procedurally defaulted claim, Petitioner must show "cause" for his state procedural error and resulting prejudice.

### 2. Cause and Prejudice; Miscarriage of Justice

Petitioner alleges in his fifth claim that his appellate attorney was ineffective for failing to raise his fourth claim on direct appeal. Constitutionally ineffective assistance of counsel is cause for a procedural default. *Carrier*, 477 U.S. at 488. However, an appellate attorney is constitutionally ineffective only if (1) the attorney acted unreasonably in failing to discover and raise nonfrivolous issues on appeal and (2) there is a reasonable probability Petitioner would have prevailed on appeal if his attorney had raised the issue. *Smith v. Robbins*, 528 U.S. 259, 285 (2000) (citing *Strickland*, 466 U.S. at 687-91, 694).

When assessing the prejudice prong of this test, the Court considers the strength of the claims that appellate counsel failed to raise. *Carter v. Parris*, 910 F.3d 835, 841 (6th Cir. 2018) (citing *Wilson v. Parker*, 515 F.3d 682, 707 (6th Cir. 2008)). "If there is no 'reasonable probability that inclusion of the issue would have changed the result of the appeal,' then habeas relief will not be granted." *Id.* (quoting *McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004)), *petition for cert filed* (U.S. Apr. 23, 2019).

Petitioner averred in a sworn affidavit signed on April 20, 2015, that before his third interview with the police, he told Sergeant Guerro to take him to the county jail or to get a lawyer for him. Sergeant Guerro allegedly responded by telling Petitioner that a lawyer would not help him at that point and that he should talk with Sergeant Brown about going to jail.

Petitioner claims that he replied to Sergeant Guerro's comment by asserting that he wanted a lawyer. Shortly afterward, the officers took him to see Sergeant Brown, and the third interview commenced. *See* Mot. to Reopen Habeas Proceedings, Ex. A, Affidavit of Gary Lee Robinson, p. 1, ECF No. 14, PageID. 2261.

Petitioner goes on to say in his affidavit that he told his pretrial attorney about his encounter with Sergeant Guerro, but his attorney did not encourage him to testify at the pretrial evidentiary hearing or advise him of his right to testify at the hearing. Instead, the attorney stated that the prosecution would not be calling Guerro as a witness because Guerro did not appear on the recording of the police interrogation of Petitioner. *Id.*, pp. 1-2, PageID. 2261-62.

The first prong of the test for ineffective assistance of appellate counsel requires showing that counsel acted unreasonably in failing to discover and raise nonfrivolous issues on appeal. Sergeant Guerro did not interview Petitioner, and there is no mention of Guerro in the pretrial proceedings. Further, Petitioner does not allege that he informed his appellate attorney about Sergeant Guerro, and he did not sign his affidavit until more than a year and a half after his appeal of right concluded. For these reasons, appellate counsel did not act unreasonably in failing to discover and raise Petitioner's fourth claim on direct appeal.

Petitioner also fails to satisfy the prejudice prong of the test for ineffective assistance of appellate counsel. Petitioner's allegation that he requested an attorney when he spoke with Sergeant Guerro is not consistent with the rest of the state-court record. The transcript of Petitioner's third interview and Sergeant Brown's testimony at the evidentiary hearing and at trial indicate that Petitioner initiated the third interview with Brown and then voluntarily confessed to his involvement in the murder. This contradicts Petitioner's averment in his

affidavit that, before his third interview with Sergeant Brown, he wanted to go to jail or have an attorney appointed. Thus, Petitioner's claim that trial counsel should have called Guerro as a witness or advised Petitioner of his right to testify at the state evidentiary hearing lacks merit, and there is not a reasonable probability that Petitioner would have prevailed on appeal if appellate counsel had raised the issue of trial counsel's alleged ineffectiveness.

Appellate counsel was not ineffective. Therefore, she was not "cause" for Petitioner's procedural error of failing to raise his fourth claim on direct appeal.

The Court need not determine whether the alleged constitutional error prejudiced Petitioner, because he has failed to show cause for his failure to comply with state law. *Smith*, 477 U.S. at 533; *Simpson*, 238 F.3d at 409. Additionally, a miscarriage of justice will not occur if the Court declines to adjudicate Petitioner's claim on the merits, because Petitioner did not present the Court with any new and credible evidence of actual innocence. His fourth claim is procedurally defaulted.

## E.  Appellate Counsel

In his fifth and final claim, Petitioner raises his argument about appellate counsel as an independent claim. Petitioner asserts that his appellate attorney should have investigated or raised a claim about his pretrial attorney's failure to advise Petitioner of the right to testify at the evidentiary hearing on his motion to suppress his statement to the police.

An indigent defendant has no constitutional right to compel appointed counsel to raise nonfrivolous claims on appeal, *Jones v. Barnes*, 463 U.S. 745, 751 (1983), and, as pointed out above, Petitioner's underlying claim about his pretrial attorney lacks merit. "[B]y definition,

30

appellate counsel cannot be ineffective for a failure to raise an issue that lacks merit." *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001). Petitioner, therefore, has no right to relief on his independent claim about appellate counsel.

## IV. Conclusion

Petitioner's claims either lack merit or are procedurally defaulted. Furthermore, the state courts' rejection of the claims was not objectively unreasonable or so lacking in justification that there was an error beyond any possibility for fairminded disagreement. The Court, therefore, denies the application for a writ of habeas corpus.

## V. Certificate of Appealability; *In Forma Pauperis* Status on Appeal

"[A] prisoner seeking postconviction relief under 28 U.S.C. § 2254 has no automatic right to appeal a district court's denial or dismissal of the petition. Instead, [the] petitioner must first seek and obtain a [certificate of appealability.]" *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327. The Supreme Court explained in *Slack v. McDaniel*, 529 U.S. 473 (2000), that when

> a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong . . . . When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner

shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Id.* at 484 (2000).

Reasonable jurists could debate the Court's assessment of Petitioner's first claim regarding the voluntariness of his statement to the police. Accordingly, the Court grants a certificate of appealability on that claim. The Court also grants permission to proceed *in forma pauperis* on appeal, because an appeal from the Court's decision could be taken in good faith. 28 U.S.C. § 1915(a)(3).

Petitioner's second and fourth claims are procedurally defaulted, and reasonable jurists would not find it debatable whether the Court's procedural ruling is correct or whether Petitioner stated a valid claim of the denial of a constitutional right. Further, reasonable jurists would not find the Court's assessment of Petitioner's third and fifth claims debatable or wrong. Accordingly, the Court declines to issue a certificate of appealability on claims two through five.

s/ Victoria A. Roberts
VICTORIA A. ROBERTS
UNITED STATES DISTRICT JUDGE

Date: 7/30/19